HARRIS TRUST & SAVINGS BANK *et al.*, Plaintiffs-Appellees, v. GORDON GALE MacLEAN *et al.*, Defendants-Appellees (William Shellman Morse, Defendant-Appellant; Walter P. Dahl, Guardian *ad litem* for minors and unborn persons who do or will trace their relationship to Norman W. Harris through one or more adoptions, Defendant-Appellant; Stewart S. Dixon, Guardian *ad litem* for minors and unborn persons who do or will trace their relationship to Norman W. Harris by blood, Defendant-Appellant).

First District (1st Division)   Nos. 1—88—0922, 1—88—0927, 1—88—0972 cons.

Opinion filed July 31, 1989.—Rehearing denied August 30, 1989.

Freeborn & Peters, of Chicago (Peter I. Mason, Margaret S. Garvey, and Andy V. Jonusaitis, of counsel), for appellant William Shellman Morse.

James E. Dahl & Associates, of Chicago (Walter P. Dahl, of counsel), for appellant Walter P. Dahl.

Wildman, Harrold, Allen & Dixon, of Chicago (Robert E. Hamilton, of counsel), for appellant Stewart S. Dixon.

Schiff, Hardin & Waite, of Chicago (Paul B. O'Flaherty and William A. Montgomery, of counsel), for appellees Harris Trust & Savings Bank, Norman W. Harris III, Huntington Harris, Stanley G. Harris, Jr., and Thomas B. Harris.

Lord, Bissell & Brook, of Chicago (Joseph E. Coughlin, of counsel), for appellee Gordon Gale MacLean.

JUSTICE BUCKLEY delivered the opinion of the court:

Norman W. Harris died on July 15, 1916. Before his death, he created a trust by means of a will dated January 24, 1911 (the Trust un-

der Will), and three later-date codicils. He also executed a separate trust instrument dated April 20, 1914 (the 1914 Trust). Trustees under the Trust under Will and the 1914 Trust—Harris Trust and Savings Bank, Norman W. Harris, III, Stanley G. Harris, Jr., and Thomas B. Harris[1]—brought suit in the circuit court of Cook County to obtain approval of accounts and to resolve various issues of construction.

In their complaint, the trustees named as defendants all living persons who trace their relationship lineally to Norman Harris through either blood or adoption. Two of these defendants answered and filed their appearances:[2] Gordan Gale MacLean, a blood-related grandson of Norman Harris and a current income beneficiary, and William Shellman Morse, an adopted son of Charity Bent Harris Morse, the blood-related granddaughter of Norman Harris and a current income beneficiary.

The circuit court appointed Walter P. Dahl as guardian *ad litem* to represent all minor defendants and unborn persons who trace or will trace their relationship to Norman Harris through adoption. The court further appointed Stewart S. Dixon as guardian *ad litem* to represent all minor defendants and unborn persons who trace or will trace their relationship to Norman Harris by blood.

From the hearing on the trustees' complaint and the circuit court's "Final Judgment and Consent Decree," defendant Morse and guardian Dahl appeal, contending that the circuit court erred in finding that persons related to Norman Harris through one or more adoptions are not beneficiaries of the Trust under Will and the 1914 Trust. The trustees have responded to this appeal. In addition, guardian Dixon appeals the circuit court's order, contending that the circuit court erred in finding that the trustees had no authority to make an equitable adjustment between income and principal due to a tax benefit received by the income beneficiaries. The trustees and defendant MacLean have responded to this appeal.

The facts relevant to the circuit court's ruling on the adoption issue will be first outlined, while those pertinent to its ruling on the equitable adjustment issue will be set forth later in this opinion.

---

[1]Huntington Harris was also acting as trustee at the time this suit was filed. Subsequently, he resigned as trustee on July 15, 1987.

[2]Four named party-defendants related to Norman Harris by adoption did not appear or answer and a default judgment was entered against them: John Bartlett MacLean II, Mary Lynne Riley MacLean Garnett, and Stephen Clarke Riley MacLean—all adopted children of Gordon Gale MacLean, a current income beneficiary of the Trust under Will and 1914 Trust—and Desiree Anee MacLean, the adopted daughter of Michael Gordon MacLean, a natural-born son of Gordon Gale MacLean.

The trustees' complaint in the circuit court requested that the court construe the Trust under Will and the 1914 Trust and instruct them as to whether persons related by adoption to Norman Harris are beneficiaries under these instruments. The parties cite the following provisions as relevant to the circuit court's determination. The Trust under Will provision providing for the distribution of principal states:

> "Said trust shall terminate twenty-one (21) years after the death of the last survivor of my children and grandchildren who shall be living at the time of my death, and upon the termination of said trust the principal of said trust fund and all accumulations thereof shall go to and be divided between my lawful issue then surviving, *per stirpes*, that is to say, the then surviving lawful issue of each of my children shall take the same share or interest therein which they would have been entitled to receive under the laws of the State of Illinois now in force, if I had died intestate at the date of the termination of said trust under said trust estate."

"Article Fourth" of the 1914 Trust, also providing for the distribution of principal, states:

> "The trust created by this indenture shall terminate at the expiration of twenty (20) years after the death of the last survivor of my children and grandchildren living at the date of the execution of this indenture; and upon the termination of said trust the principal of the trust fund and estate held hereunder and all accumulations thereof shall go to and be divided between my lawful issue then surviving, *per stirpes,* that is to say: the then surviving lawful issue of each of my children shall take the same share and interest therein that they would be entitled to receive under the laws of the State of Illinois now in force if I had died intestate at the date of the termination of said trust owning said trust estate."

Similar language is used in provisions relating to the distribution of the net income in the Trust under Will and 1914 Trust.

The codicil of the will dated December 26, 1911, further provided that "descendants" of Norman Harris who meet specified qualifications may become trustees of the Trust under Will and that a majority of his descendants who are of lawful age and beneficiaries under the will shall select the active trustee.

■■ ■ In construing a will or a trust, a court's primary objective is to give effect to the testator's or grantor's intent, provided the intent is not against public policy. (*Harris Trust & Savings Bank v. Beach* (1987), 118 Ill. 2d 1, 513 N.E.2d 833; *In re Estate of Laas*

(1985), 134 Ill. App. 3d 504, 480 N.E.2d 1183; *Continental Illinois National Bank & Trust Co. v. Clancy* (1959), 18 Ill. 2d 124, 163 N.E.2d 523; *Storkan v. Ziska* (1950), 406 Ill. 259, 94 N.E.2d 185.) It is fundamental that a court must ascertain this intention from the terms of the will, by giving the words employed their plain and ordinary meaning. (*Larison v. Record* (1987), 117 Ill. 2d 444, 512 N.E.2d 1251; *In re Estate of Breault* (1963), 29 Ill. 2d 165, 193 N.E.2d 824.) A court may allow extrinsic evidence only to resolve ambiguity in the instrument. (*Larison*, 117 Ill. 2d 444, 512 N.E.2d 1251.) Courts may also resort to rules of construction, or judicial presumptions, to determine the meaning of an instrument's terms, but only where the intent of the testator cannot be ascertained from the language of the instrument. *Harris Trust*, 118 Ill. 2d 1, 513 N.E.2d 833; *Chicago Title & Trust Co. v. Schwartz* (1983), 120 Ill. App. 3d 324, 458 N.E.2d 151.

In 1925, a rule of construction was applied in *Smith v. Thomas* (1925), 317 Ill. 150, 147 N.E. 788, to interpret a will, silent as to the testator's intent with regard to adopteds, where the testator was not the adopted parent of the adopted child. *Smith* established the judicial presumption called "the stranger to the adoption rule," that, in the absence of language to the contrary, testators or settlors intended to exclude adopteds as beneficiaries. This presumption was changed by legislative enactment as to instruments executed after September 1, 1955. Section 2—4(e) of the Probate Act of 1975 provides that an adopted child will be treated as a natural child in all instruments executed after September 1, 1955, "unless the contrary intent plainly appears by the terms of the instrument." Ill. Rev. Stat. 1987, ch. 110½, par. 2—4(e).

It is apparent from the record that the circuit court, in construing the instruments in issue here, based its decision upon the testator's intent derived from the language of the instrument. The court concluded that Norman Harris intended to exclude adopteds as beneficiaries based upon his persistent use of the terms "lawful issue" and "descendants" and evidence offered as to the meaning accorded to those terms by law at the time. The court explicitly stated that, while it considered the judicial presumption and legislative change, its decision was not based upon any presumption.

The threshold question presented for our review is whether the circuit court could have derived Norman Harris' intent from the language of the instrument. The trustees argue that Norman Harris' intent may be derived from the instrument in two ways. First, they argue that the use of the words "lawful issue" and "descendants" in itself is sufficient evidence of his intent because, under their ordinary

meaning as established long before Norman Harris' death, these words refer to "one who proceeds from the body of another, however remotely." (*Bates v. Gillett* (1890), 132 Ill. 287, 297, 24 N.E. 611, 612; accord *Winchell v. Winchell* (1913), 259 Ill. 471, 474, 102 N.E. 823, 825; Bouvier's Law Dictionary 852, 1686-87 (8th ed. 1914).) The plain and ordinary meaning of this technical term, as evidenced by the excerpts from Bouvier's Law Dictionary introduced in the circuit court by guardian *ad litem* Dixon, does not indicate that the effect of this term in testamentary instruments would be to exclude adopteds. Moreover, no case law existed in 1914 which so held. Thus, we fail to see how the court could conclude that Norman Harris intended to exclude adopteds from his use of the term "issue" in 1914.

Although not relied upon by the circuit court in its findings, the second way that the trustees contend Harris' intent may be derived from the instruments is through the explanatory language in the provision relating to the distribution of the trust principal. The provision provides:

> "The trust principal shall be divided between my lawful issue then surviving *per stirpes*, that is to say, the then surviving lawful issue of each of my children shall take the same share or interest therein which they would have been entitled to receive under the laws of the State of Illinois now in force, if I had died intestate at the time of the termination of said trust."

The trustees argue that since under the adoption act then in effect an adopted individual could not inherit by right of representation from an intestate lineal or collateral relative (Adoption Act of 1874 (Ill. Rev. Stat. 1874, ch. 4, par. 5)) and since *per stirpes* traditionally as been defined as denoting a distribution by right of representation (*Mercantile Trust & Savings Bank v. Rogers* (1955), 5 Ill. App. 2d 162, 169, 124 N.E.2d 683, 686-87; Black's Law Dictionary 1030 (5th ed. 1979)), that under the laws then in existence adopteds could not have taken any share if Norman had died intestate. Thus, they reason, Norman Harris must have intended to exclude adopteds.

Defendant Morse, on the other hand, disputes that "laws *** now in force" refers to the adoption act. He argues that it most likely refers to the Illinois Descent Act of 1872 (1877 Ill. Laws 93, par. 1) because the explanatory language merely illustrates the *per stirpes method* of distribution. Since the descent statute is silent as to adoption, defendant Morse asserts that it sheds no light on Norman Harris' intent.

Yet another interpretation of the above-quoted explanatory language is that argued by defendant Dahl. He asserts that the use of the words "the then surviving lawful issue *of each of my children*"

(emphasis added), instead of repeating the words "my lawful issue then surviving," indicates an intention to explain which persons were to become beneficiaries and an intention to include adopted persons. Dahl argues that such an assertion is valid because under the Adoption Act of 1874, an adopted child was considered the lawful issue of the adopting parents. Ill. Rev. Stat. 1874, ch. 4, par. 5.

■ The above constructions of this provision demonstrate its ambiguity. We, therefore, conclude that in the absence of extrinsic evidence, Norman Harris' intent cannot be ascertained from this provision.

Such a conclusion does not preclude a finding as to Norman Harris' intent because, as already indicated, courts may resort to rules of construction to determine a testator's intent. The circuit court, however, expressly stated that it did not apply a presumptive rule of construction in reaching its decision. Because the circuit court did not consider application of a rule of construction, we remand this case for the circuit court to make that determination.

■ Although we are remanding this case to the circuit court, we believe it necessary to state that the presumption adopted by Illinois courts in 1925 should not be applied to the case at bar. The court is not bound by the judicially created "stranger to the adoption rule" since the instruments here were clearly executed before its existence. While our legislature has not forbidden the application of a presumption that excludes adopteds on instruments executed prior to 1955, it is fairly clear that today's societal attitudes favor no differentiation between adopteds and natural born children. Not only does the 1955 legislative change in the presumption toward adopteds reflect today's policy, current policy is also evidenced by numerous legislative enactments protecting adopteds from exclusion from certain benefits or rights. (See Wrongful Death Act (Ill. Rev. Stat. 1987, ch. 70, par. 2(c)); Illinois Pension Code (Ill. Rev. Stat. 1987, ch. 108½, par. 1—101 et seq.); School Code (Ill. Rev. Stat. 1987, ch. 122, par. 30—14.2); Insurance Code (Ill. Rev. Stat. 1981, ch. 73, par. 968h).) Thus, there appears to be no reasonable basis for applying a presumption which excludes adopteds in the case at bar.

Shifting focus to the second issue presented for our review, the trustees' complaint also requested that the circuit court instruct them as to whether, in response to a tax benefit in the form of deductions that the income beneficiaries received due to certain taxes and expenses which the principal paid, an adjustment between the income and principal accounts of the Trust under Will was required or permitted. On September 4, 1984, the trustees sold approximately 90%

of the assets of the trust principal, consisting of 1,475,190 shares of Harris Bankcorp stock. The amount received from the sale, $120,965,580, was added to the trust's principal account as required by the Illinois Principal and Income Act (the Act) (Ill. Rev. Stat. 1987, ch. 30, par. 501 *et seq.*). On October 15, 1985, the trustees paid $23,717,259.45 in Federal tax and $3,524,547.61 in State tax from the principal account on $117,217,129.24 in capital gains realized from the sale and other less significant capital gains.

The payment from principal of the Illinois taxes generated a Federal income tax deduction of $3,524,547.61 in the trust fiscal year following the year of the sale. Pursuant to Internal Revenue Code provisions, this deduction reduced the amount of taxable trust income otherwise reportable by the income beneficiaries.

In the circuit court proceedings, the parties stipulated that these consequences of the sale were not the result of any trustees' election, but the result of the nondiscretionary application of provisions of the Act and Federal income tax law. Guardian Dixon conceded that the Federal and State taxes paid by the trust were properly chargeable to principal and that the Internal Revenue Code does not allow the trust to deduct the State tax paid on the capital gains in computing the Federal tax paid by the trust on capital gains. On appeal, guardian Dixon argues that the circuit court's refusal to order an equitable adjustment was error due to the peculiar circumstances of this case—the inequities resulting from the sale of nearly 90% of the trust's assets in one year.

In its "Final Judgment and Consent Decree," the circuit court specified two reasons for its decision. It found that an equitable adjustment between principal and income was not appropriate in response to inequities resulting from the mandatory application of the tax laws. It further found, under the facts and circumstances of the case, that no basis existed in equity to make an adjustment between income and principal "inasmuch as both the income beneficiaries and the remainder beneficiaries received very significant benefits" from the sale of the stock.

The question of whether a trustee is required to make an equitable adjustment between the trust's income and principal accounts where inequitable consequences result from the mandatory application of tax laws is one of first impression in Illinois. Several courts in other jurisdictions have addressed this issue. Some courts have suggested that an equitable adjustment should only be applied in response to a trustee's election or discretionary decision (*In re Dick's Estate* (1961), 29 Misc. 2d 648, 218 N.Y.S.2d 182; *In re Kent's Estate*

(1964), 23 Fla. Supp. 133), while one court has approved an adjustment to correct inequities not caused by any discretionary decision of the trustees (*Rice Estate* (1956), 8 Pa. D. & C. 2d 379) and another has rejected a distinction between discretionary decisions and mandatory applications (*In re Holloway's Estate* (1972), 68 Misc. 2d 361, 327 N.Y.S.2d 865).

■ We believe the better view is that equitable adjustments should be applied only in response to inequities resulting from a trustee's discretionary decision which favor one beneficiary or class of beneficiaries over another. We agree with the trustees' position that the common law doctrine of equitable adjustments should only be employed in such circumstances because this concept is grounded in the fiduciary duty of a trustee not to be partial in making decisions or elections impacting on successive beneficiaries. (See *In re Warms' Estate* (Surr. Ct. 1955), 140 N.Y.S.2d 169; *In re Bixby's Estate* (1956), 140 Cal. App. 2d 326, 295 P.2d 68.) The fiduciary should not be required to cure the inequities resulting from the application of mandatory tax laws; rather, any corrective action is more properly left for the legislature. *In re Dick's Estate*, 29 Misc. 2d 648, 218 N.Y.S.2d 182; accord *In re Kent's Estate* (1964), 23 Fla. Supp. 133.

Moreover, it appears an equitable adjustment by the trustees here would violate the provisions of the Act. The Act governs the ascertainment of income and principal and the apportionment of receipts and expenses in all cases where a trust is established to the extent not inconsistent with the provisions of the instrument. (Ill. Rev. Stat. 1987, ch. 30, par. 503(a).) Section 503(b)(4) of the Act gives trustees discretion to allocate an expenditure to income or principal only where the trust instrument or the provisions of the Act would not be applicable. The Act provides that the proceeds from the sale of stocks and bonds are to be included in principal and that the tax upon any gain allocated to principal is to be charged against principal. (Ill. Rev. Stat. 1987, ch. 30, pars. 504(b)(1), 514(c)(5).) Since the equitable adjustment requested here would, in effect, apportion the capital gains tax, the adjustment may be in contravention to the above provisions.

■ Finally, apart from our holding that an equitable adjustment would not be appropriate for inequities resulting from mandatory application of the tax laws, we further hold that the circuit court's finding that no basis in equity exists under these circumstances to warrant an equitable adjustment is not against the manifest weight of the evidence. The "inequity" of which guardian Dixon complains is that the income beneficiaries received the benefit of capital gains taxes paid by the principal beneficiaries pursuant to its receipt of proceeds

from the sale of certain stock. In finding no inequity, the court emphasized that both the income beneficiaries and the principal beneficiaries received significant benefits from the sale of the stock. The record clearly indicates that as a result of the sale of the stock, the principal beneficiaries received over $120 million in gross sales proceeds, whereas the benefit received by the income beneficiaries in the form of tax deductions was relatively small in comparison. We fail to perceive the inequity resulting to the principal beneficiaries to which guardian Dixon complains.

In summary, we reverse the circuit court's finding that persons related to Norman Harris through adoption are not beneficiaries of his Trust under Will and 1914 Will and remand the case for further proceedings consistent with this opinion. We affirm its order directing the trustees not make an equitable adjustment between the trust's income and principal accounts.

Affirmed in part; reversed in part and remanded.

CAMPBELL and O'CONNOR, JJ., concur.